C. S. WOOTEN, Adm'r of WAIT THOMPSON v. JOHN V. SHERRARD and others.

The maker of a note payable on demand, may at any time before the demand, make a tender, which will have the same effect, as if the note was payable on a certain day, and the tender was made on that day.

Confederate treasury notes were issued by that government with the intent that they should circulate as money, and practically, both by banks and individuals, they were deemed and treated in all ordinary business as money.

The Courts of this State have habitually treated notes payable in Confederate money, as having all the attributes of promissory notes, and a tender of the like money in payment of such, which the payee refused to receive, will not bar the debt.

CIVIL ACTION, tried before *Clarke, J.,* at the January (Special) Term, 1872, of WAYNE Superior Court.

Plaintiff brought his action upon the following bond, given to his intestate :

" With interest from date, we promise to pay Waitmore Thompson the sum of twenty hundred dollars, for value received. Oct. 6th, 1862.

Signed,          JOHN V. SHERRARD, [SEAL.]
                 WM. LEWIS,        [SEAL.]
                 JOHN COLEY,       [SEAL.]

Upon which a payment of $60, was indorsed January 12th, 1867, and also another payment of $134. September 16th, 1869.

The defendants did not deny the execution of the bond ; but alleged that the note was given for borrowed Confederate money, and that there was an express understanding between the parties, at the time the bond was given, to the effect, that it should be solvable in Confederate currency, at any time within twelve months after its date. They further alleged, that a tender of payment in Confederate money, to the full amount due on the bond, was made by defendant Sherrard, once or twice before the expiration of the twelve

months, and several times afterwards, and that the plaintiff's testator each time refused to accept the same.

The defendants, Sherrard and Lewis, further answered specially that they had been declared bankrupt, and had received their discharges in bankruptcy.

When the case was called in the Court below, the defendant, Coley moved for a separate trial, which was objected to, but allowed by the Court, and the case was tried as against Coley alone. On the trial, the defendant, Coley, called Sherrard, the principal in the bond sued on, and proposed to prove that at the time the bond was given there was an agreement and understanding between him and the plaintiff's intestate. This being objected to, the defendant proposed to show that Sherrard had received his discharge in bankruptcy, which testimony was also objected to. His Honor overruled both objections, and the allegations contained in the answer of the defendants were proven by the evidence of Sherrard.

Upon issues submitted to them, the jury found the following facts:

1. That the bond sued on was given for Confederate money:

2. That it was the understanding, when the bond was given, that the obligee, the intestate of the plaintiff, would receive in payment of the bond Confederate money at any time within twelve months from its date.

3. That a tender of Confederate money had been made as alleged.

His Honor having held that the tender by Sherrard discharged the bond *in toto* gave judgment in favor of the defendants and against the plaintiff for costs. From this judgment the plaintiff appealed.

*Faircloth,* for appellant.
*Smith & Strong,* contra.

RODMAN, J. The complaint alleges, that on the 6th October, 1862, Sherrard borrowed of Thompson $2,700 in Confederate money, and gave him a note for that sum payable on demand in dollars generally, to which Lewis and Coley were sureties. Some small payments were made on the note in 1867 and 1869, but a residue remains due. The plaintiff is administrator of Thompson.

The answer admits the execution of the note, and that it has not been paid in full, but says that at the making of the note it was agreed between Thompson and Sherrard, that the latter might pay it at any time within twelve months after its date, in Confederate money, and that within that time Sherrard did tender the amount due, which Thompson refused to receive. Sherrard and Lewis plead their certificates of discharge in bankruptcy. Issues were submitted to the jury, and they find the defences above set forth to be true. The Judge gave judgment for defendants; from which plaintiff appealed.

We think it immaterial, whether the evidence of Sherrard to prove that Thompson agreed to take payment in Confederate money at any time within twelve months after the date of the note, was competent or not. The construction of the note would be the same in either case. The maker of a note payable on demand, may at any time before demand make a tender which will have the same effect as if the note were payable on a certain day, and the tender was made on that day.

The act of 1866 makes the note presumptively payable in Confederate money, and the presumption is not rebutted or attempted to be.

The only question, therefore, is as to the effect of the tender of Confederate money in May, 1863. We have twice considered this question recently. *Terrell* v. *Walker* 65 N. C. Rep. 91. S. C. 66, N. C. Rep.

Since these decisions we have considered the subject in

every light in which it has occurred to us, and we have seen no reason to doubt of their soundness.

If a contract to pay in Confederate money is to be governed by the rules which apply to contracts to pay money generally, it cannot be contended that a tender which the creditor refuses, bars the debt. 2 Pars. Cont. 638. If such contract is to be regarded as being for the delivery of specific articles, a tender would have a different effect. *Patton.* v. *Hunt,* 64 N. C. Rep. 163.

At first it might have been a debatable question as to how, upon general principles of equity, justice, and public convenience, such contracts should be treated. That question must now be considered settled by the view which has been heretofore uniformly taken of them, by the usage of the people, the enactments of the Legislature and the decisions of our Courts. Confederate treasury notes were issued by that government, with the intent that they should circulate as money. They were never pretended to be made a legal tender, as United States treasury notes were, but for several years they did circulate as money among the millions of people within the lines of the Confederate States, just as the United States treasury notes did without those lines.

Notes intended and agreed to be payable in them, were written payable in dollars generally. Practically they were deemed and treated in all ordinary business as money, both by banks and individuals.

The Convention of 1865, and the Legislature of 1866, by the ordinance and acts, which have been so frequently referred to in the decisions upon this subject, spoke of them as money, and provided a scale, by which their value at different dates, should be ascertained and enacted that a note given upon a loan of Confederate money should be deemed payable in gold of the value of the loan *at the date of the note.*

22

Thus, certainly, declaring that such notes were not to be treated as contracts for specific articles, because upon a breach of such a contract, the well known and the only just rule fixes the damages at the value of the article *at the time for the delivery*. And in respect to contracts strictly for the future delivery of such articles, as cotton, wheat, &c., it is at least doubtful, whether a Legislature could constitutionally alter that rule.

The Courts of this State have habitually treated notes payable in Confederate money, as having all the attributes of promissory notes, and in no single instance, has it been suggested that they were to be governed by the rules applicable to contracts for specific articles. Actions of debt have been maintained on them. *Parker* v. *Carson*, 64 N. C. Rep. 563. Payments made in them have been pleaded and treated as payments of money. Interest has been adjudged on them, at the rate fixed by law for money contracts. The interest has been habitually calculated by the Clerks of Courts, as statutory damages for the detention of money. They have been considered negotiable by endorsement, and the endorsers held liable as such. *Woodfin* v. *Sluder*, Phil. 200. *Phillips* v. *Hooker*, Phil. Eq. 193. *Summers* v. *McKay*, 64 N. C. Rep. 555. None of which incidents attach to contracts for the delivery of specific articles. Sheriffs and clerks, executors and guardians, have been held justified in receiving payment in them, while they scarcely would have been in receiving strictly specific articles.

It is true, that notes payable on their face in bank bills, have been regarded as contracts for specific articles. *Patton* v. *Hunt*, *ubi sup*. 206. But that would not be so if the mode of payment did not appear on its face, nor except under peculiar circumstances would parol evidence be received to prove such an agreement. But bank bills cannot be considered in the same light as Confederate treasury notes. They have never been the *sole* currency of the country, as

these were; and there has never been a statutory presumption, that contracts for *money* were payable in them. The view which this Court took of such contracts from the first, has been also taken by the Supreme Court of the United States in *Thorington* v. *Smith*, 8 Wall 1, and in all of the Southern States whose reports I have examined.

In Virginia alone, in the first case which occurred on this subject, *Dearing* v. *Rucker*, 18 Grat. 434, a majority of the Court regarded contracts payable in Confederate money, as contracts payable in specific articles, and held that the damages for a breach were the value of the money *at the time of its delivery.* MONCURE, J., dissented. The question occurred to the learned and able Judge, who delivered the opinion of the Court, what was to be done when the delivery was to be made at a date which came after the close of the war? To be consistent, he would have been obliged to hold, that a delivery then of the worthless paper would have been good, although the payer had received value; but he shrunk from this conclusion, and thereby confessed the weakness of the argument. That Court has since then been constantly struggling to avoid the inequitable consequences of their general rule in particular cases. *Lohman* v. *Crouch*, 19 Grat. 331; *Magill* v. *Manson*, 20 Grat. 527, until at last if they can be said to have any general rule, it is in conformity with ours. *Stover* v. *Hamilton*, 21 Grat. 273. *Parish* v. *Dyce*, Ib. 303.

In its first decision that Court went on the idea that every transaction in Confederate money was a speculation in a fluctuating commodity, and concluded that the seller for future delivery, was entitled to the profits of the depreciation. As to the country generally, however, it may have been in Richmond, the theory was not true in fact until very near the close of the war, and as soon as it became true, the money ceased to circulate. Our Courts have gone on the equity, that the borrower ought to return the value

which he received. That is the foundation of our legislation and of our decisions.

But even in Virginia, where that consequence might seem to follow from the theory, that Confederate treasury notes were specific articles, it has never been supposed that a tender and refusal barred the debt. *Magill* v. *Manson, ubi supra.*

In Tennessee, the doctrine finally established is substantially the same with ours. 1 Heisk.

In Georgia it seems that the jury finds the value of the contract at discretion. *Cohen* v. *Ward,* 42 Ga. 337. In all the States, however, except our own, the law seems to be in a disastrous state of uncertainty, from which we have happily escaped through the wisdom and moderation of the Legislature and of our predecessors.

It should not escape attention, that whatever rule may be applied to contracts for the payment of money made during the war, cases will occur which appear hard. Whenever a thing which once had value loses it, the loss must fall on one of two equally innocent parties. No Court could or should be allowed to decide each case according to its particular equity. General rules must be established for the welfare and repose of society, they must be adhered to, unless shown to be plainly unreasonable.

Judgment reversed, and *venire de novo.*

Let this opinion be certified.

PER CURIAM. *Venire de novo.*